1
2

*IN THE UNITED STATES DISTRICT COURT*
*FOR THE WESTERN DISTRICT OF MICHIGAN*
*SOUTHERN DIVISION*

3

DANIELLE S. SCOTT #194644,

4

            Plaintiff,

5

vs.                                    Case No. 1:14-cv-1277

6

DANIEL H. HEYNS, et al.,

7

            Defendants.

8

_____/

9

*EXCERPT OF JURY TRIAL – VOLUME 1*
*(Testimony of Witness Betty and Witness Lewis)*

10

*HELD BEFORE THE HONORABLE HALA JARBOU, U.S. DISTRICT JUDGE*

11

*Lansing, Michigan, Monday, March 1, 2021*

12

13 APPEARANCES:
For the Plaintiff:    DANIEL E. MANVILLE (P39731)
                      Associate Clinical Professor
14                    Michigan State University College of Law
                      610 Abbot Road
15                    East Lansing, MI 48823

16                    HALEY REGAN, Law Student
                      GINA GOLDFADEN, Law Student
17

For the Defendant:   O.G. JOSEPH PAUL REASONS
18                    MICHAEL DEAN
                      Michigan Department of Attorney General
19                    PO Box 30217
                      Lansing, MI 48909-7717
20                    (517) 335-3055

21 ALSO PRESENT:       Danielle Scott #194644, Plaintiff
                      Daryl Becher, Defendant
22

REPORTED BY:         MS. MELINDA DEXTER, CSR-4629, RMR, CRR
23                    Federal Official Court Reporter
                      128 Federal Bldg
24                    315 W Allegan St
                      Lansing MI 48933
25                    (517) 604-1732

1        *****

2               Lansing, Michigan

3               Monday, March 1, 2021

4               At 1:49 p.m.

5               THE CLERK:  All rise.

6                       (At 1:49 p.m., the jury entered the

7                       courtroom.)

8               THE COURT:  All right.  Thank you, everyone.  Please

9        be seated.

10              All right.  Plaintiff's next witness.  Who is that?

11              MS. GOLDFADEN:  Our next witness is Quentin Betty.

12              THE COURT:  Okay.  We are going to do this through

13       video conferencing.

14              Sir, can you see and hear us?

15              MR. BETTY:  Yes, ma'am.

16              THE COURT:  Tell me your full name, please.

17              MR. BETTY:  Quentin Betty, B-E-T-T-Y.

18              THE COURT:  Okay.  Thank you.

19              All right.  Who is proceeding with this witness?

20              MS. GOLDFADEN:  I am.

21              THE COURT:  Go ahead.

22              MS. GOLDFADEN:  Ms. Goldfaden.

23              THE COURT:  Oh, I'm sorry.  Hold on.  Let's swear him

24       in.  We're forgetting our normal things because everything is

25       different.  So...

1          All right.  Mr. Betty, if you'll stand and raise your

2     right hand, please.  Thank you.

3          THE CLERK:  (Witness was sworn.)

4          MR. BETTY:  Yes.  I swear.

5          THE COURT:  Have a seat.  Thank you.  Have a seat.

6          All right.  Counsel, go ahead.

7                         *QUENTIN BETTY*

8     called by the Plaintiff at 1:50 p.m., having been duly sworn

9      by the clerk, testified through videoconferencing as follows:

10                    *DIRECT EXAMINATION*

11     BY MS. GOLDFADEN:

12     Q.   Okay.  Okay.  Mr. Betty, how old are you?

13     **A.   I'm forty-four.**

14     Q.   And what prison are you currently confined at?

15     **A.   Muskegon Correctional Facility.**

16     Q.   And is that the same facility as Mr. Scott?

17     **A.   Yes, ma'am.**

18     Q.   The same one that he was confined at?

19     **A.   Excuse me?**

20     Q.   The one that he is confined at?

21     **A.   Yes, ma'am.**

22     Q.   Okay.  Thank you.  And how long have you been in Muskegon

23     Correctional Facility?

24     **A.   Approximately, two years.**

25     Q.   And have you discussed this litigation with Mr. Scott at

1   all?

2   **A.    Yes, I have.**

3   Q.    And do you have a lawsuit related to this case?

4   **A.    Yes, I do.**

5   Q.    And are any of the prison staff in Mr. Scott's case a

6   party in your lawsuit?

7   **A.    No.**

8   Q.    And is Mr. Scott a witness in your lawsuit?

9   **A.    Yes.**

10  Q.    And will your conversations with Mr. Scott affect your

11  ability to testify truthfully at this trial?

12  **A.    No, ma'am.**

13  Q.    Okay.  Mr. Betty, I'm now going to ask you about

14  October 10th, 2013.  And on that date, were you confined with

15  the Michigan Department of Corrections?

16  **A.    Yes, I was.**

17  Q.    And were you placed on a transport bus on October 10th,

18  2013?

19  **A.    Yes.**

20  Q.    And what prison were you located at before you were being

21  transported that day?

22  **A.    Macomb Correctional Facility.**

23  Q.    And where did the transport bus from Macomb go to?

24  **A.    From Macomb, the transportation bus stopped in St. Louis,**

25  **Michigan.**

1   Q.   And did the bus stop anywhere else?

2   **A.   Not at that time, no.**

3   Q.   Where was your end destination that day?

4   **A.   To Michigan Reformatory, formerly known as MR.**

5   Q.   And where is Michigan Reformatory located?

6   **A.   It's located in Ionia, Michigan.**

7   Q.   And on your trip to Ionia Michigan Reformatory, did the

8   bus stop at Carson City?

9   **A.   Yes.**

10   Q.   And were you -- where were you sitting on the bus on this

11   trip from Macomb to Ionia?

12   **A.   I believe I was in the third -- I mean, the fourth or the**

13   **fifth row on the passenger's side.**

14   Q.   And prior to October 10th, 2013, had you been transferred

15   to other prisons before?

16   **A.   Yes.**

17   Q.   And do you remember about how many times?

18   **A.   I would say over ten.**

19   Q.   And do you know who the driver of the bus was on

20   October 10th, 2013?

21   **A.   I do now.**

22   Q.   And who was that?

23   **A.   Officer Becher or Beecher.**

24   Q.   And were you paying attention as to how fast Defendant

25   Becher was driving the bus on October 10th, 2013?

1  **A.   Well, from -- from the seat that I was in, you couldn't**

2  **really see the speedometer, but it felt like we were going at**

3  **an excessive rate of speed.**

4  Q.   And why did you feel that he was going at an excessive

5  rate of speed?

6  **A.   Because we kept telling -- because we told the guy to slow**

7  **down.  Everyone felt that he was going too fast.**

8  Q.   And did you tell him to slow down?

9  **A.   Yes, I did.**

10  Q.   And was he speeding after he left the Carson City prison?

11  **A.   I believe so.  To my recollection, yes.**

12  Q.   And at that time, was he going faster than you had

13  traveled on MDOC buses in your earlier transports?

14  **A.   Yes.**

15  Q.   And how many times did you tell Defendant Becher to slow

16  down?

17  **A.   Maybe two or three.**

18  Q.   And were you loud when you said it?

19  **A.   Yes.**

20  Q.   How loud -- how loud were you when you said it?

21  **A.   I have a very -- I have a very distinct voice.  So I**

22  **believe that my voice probably carried over most of the guys**

23  **that was on the bus.  So I would say I was pretty loud.**

24  Q.   Was the bus noisy?

25  **A.   Yes.**

1    Q.   And were other inmates yelling?

2    **A.   Yes.**

3    Q.   And how did Defendant Becher respond to your comments?

4    **A.   Initially he kept speeding, and then at one point he told**

5    **us to quit our crying.**

6    Q.   And, Mr. Betty, did an incident occur between Carson City

7    and Ionia?

8    **A.   Yes.**

9    Q.   Can you tell the jury what you believe happened?

10   **A.   We traveling at a high rate of speed on I believe it's**

11   **Blackmer Road, and Officer Becher lost control of the bus.**

12   **The bus fishtailed hard to the left and to the right.  And at**

13   **that point, when he was trying to get the bus under control,**

14   **the bus came up on -- what it felt like to us like two wheels**

15   **and slammed back down.**

16   Q.   And when the bus went up in the air, were you thrown from

17   your seat?

18   **A.   Yes.  I was -- I was slightly lifted out of my seat.**

19   Q.   And what else happened when you were slightly lifted from

20   your seat?

21   **A.   I was in the passenger's seat on the window seat.  There**

22   **was a guy, another prisoner, sitting to my left.  So as I --**

23   **as I went airborne, he went airborne, and that guy end up**

24   **landing on top of my head and neck.  That's how I suffered**

25   **injuries.  And another guy -- I saw other guys being ejected**

1  from their seats as well.

2  Q.   And did you complain of your injuries to Defendant Becher?

3  **A.   Yes, I did.**

4  Q.   And did other inmates on the bus also complain of

5  injuries?

6  **A.   Yes, they did.**

7  Q.   And did you see how many other prisoners were thrown from

8  their seats on the bus?

9  **A.   I believe it was two, but I know Mr. Scott, he was thrown**

10  **from his seat.  He was in the aisle.  And I believe it was a**

11  **guy -- I can't -- I don't know the other guy's name, but it**

12  **was another guy for sure.**

13  Q.   And after the incident occurred, did Defendant regain

14  control of the vehicle?

15  **A.   Yes, he did.**

16  Q.   And while you're on the bus, did you hear Defendant Becher

17  mention a dead animal being in the road?

18  **A.   No, ma'am.**

19  Q.   And did you hear any other prison staff mention a dead

20  animal being in the road?

21  **A.   No, ma'am.**

22  Q.   And after Defendant Becher regained control of the bus,

23  what happened?

24  **A.   We proceeded to Ionia Correctional Fac -- I-Max**

25  **Correctional Facility.  And once we was at I-Max Correctional**

1    Facility, other Ionia area prisoners were called to pick up

2    the prisoners that was going to those designated facilities.

3              For example, I went to MR, Michigan Reformatory.

4    Other guys went to MTU, and some guys went to Bellamy Creek,

5    and some guys stayed at I-Max Correctional Facility.

6    Q.   And to clarify, MR is Michigan Reformatory, which I

7    believe you said earlier.  MTU and I-Max; these are all

8    prisons that are located in Ionia?

9    A.   Yes, ma'am.

10   Q.   All right.  And now I'm going to move on to some questions

11   about what the inside of the bus looked like.  So...

12   A.   Okay.

13   Q.   Mr. Betty, can you describe what the inside of the bus

14   looked like?

15   A.   There is a cage as you enter the bus.  There is a cage

16   that separates the officers from the prisoners.  There is

17   approximately ten rows of seats, maybe 20 rows of seats.

18   There is -- there is a urinal on the left side of the bus.  If

19   you're -- on the passenger's side of the bus, there is a

20   urinal.

21              There is a cage in the back.  I guess it's used for

22   Level 5 prisoners.  You're chained.  You're shackled and

23   chained from the feet, and you're shackled and chained from

24   the wrists to your waist.  On the bus, there is no seatbelts

25   on the bus.

1    Q.   And, Mr. Betty --

2    **A.   And I believe there's --**

3    Q.   -- were there cameras --

4    **A.   Oh.**

5    Q.   -- on the bus?

6    **A.   Oh, yes.   There is approximately about nine cameras on the**

7    **bus, and there is -- there is a monitor that you can see the**

8    **camera angles.**

9    Q.   And, Mr. Betty, can you see out the front windshield of

10   the bus?

11   **A.   Yes.**

12   Q.   And how far down the road could you see out of that front

13   windshield?

14   **A.   You could see in the distance.   You couldn't see, like,**

15   **immediately in front of the bus, but you could see the**

16   **distance.**

17   Q.   Could you see about a quarter of a mile down the road?

18   **A.   Yes.**

19   Q.   And were you looking at the front windshield just before

20   the incident?

21   **A.   Yes.**

22   Q.   And did you see any objects in the road just before the

23   incident?

24   **A.   No, ma'am.**

25   Q.   And could you see anything in the road just before the

1    incident?

2    **A.    No, ma'am.**

3    Q.    Okay.   Lastly, I'm going to ask you some questions about

4    your prior experiences in transport.   So, Mr. Betty, over the

5    years that you have been confined, have you been in similar

6    transport buses prior to the incident of October 10th, 2013?

7    **A.    Yes, I have.**

8    Q.    And have you ever been involved in an incident while on

9    these past transport buses?

10   **A.    No, ma'am.**

11   Q.    And have you been in a transport bus where the Defendant

12   was the driver?

13   **A.    No, ma'am.**

14   Q.    And when you were on those other transportation buses, did

15   any of those drivers drive in a reckless manner?

16   **A.    No, ma'am.**

17   Q.    And when you were on those other transportation buses,

18   were you ever tossed from your seat?

19   **A.    No, ma'am.**

20   Q.    And when you were on those other transportation buses, did

21   the drivers of those buses drive in the manner that Defendant

22   Becher did on October 10th, 2013?

23   **A.    No, ma'am.**

24         MS. GOLDFADEN:   Your Honor, may I have a moment to

25   talk with my co-counsel?

```
 1              THE COURT:  (No response.)

 2              MS. GOLDFADEN:  Thank you.

 3              I have no further questions.

 4              THE COURT:  Thank you.

 5              MR. DEAN:  Yes, Your Honor.

 6                       CROSS-EXAMINATION

 7    BY MR. DEAN:

 8    Q.   Mr. Betty, this is Michael Dean from the AG's Office, and

 9    I am going to ask you a few questions.  A few minutes ago you

10    testified when you were asked to describe the bus.  You gave a

11    lot of features, and then you said, "Oh, yeah.  There were

12    nine cameras and a monitor."

13              Did you --

14    A.   Mm-hmm.

15    Q.   -- talk to anybody to tell you to mention that in your

16    testimony today?

17    A.   No, sir.

18    Q.   You just -- it came to you just then to add that you saw

19    nine cameras and a monitor, correct?

20    A.   No.  I recall -- she asked me to describe the bus, and I

21    recall that there was -- there is a little screen, and it has

22    nine little camera -- camera views that you can see.  You can

23    see the outside of the bus.  You can see the inside of the

24    bus.

25    Q.   Okay.  Actually that wasn't my question, though.  I was --
```

1    I wanted to know what made you think to mention the cameras

2    when you described the bus.

3    **A.   Because she asked me to describe the inside of the bus,**

4    **and this is part of the inside of the bus, sir.**

5    Q.   Okay.  Okay.  I -- I was just asking.  You said, "Oh,

6    yeah," like you suddenly forgot you were supposed to mention

7    that.  Were you --

8    **A.   No.**

9    Q.   Did anyone talk to you about --

10   **A.   Excuse me?**

11           MS. GOLDFADEN:  Objection.  Argumentative.

12           MR. DEAN:  I'll move on, Your Honor.

13           THE COURT:  Go ahead.

14   BY MR. DEAN:

15   Q.   You filed a lawsuit in this case, correct, about this --

16   **A.   Yes, sir.**

17   Q.   -- incident?

18   **A.   Yes, I did.**

19   Q.   And you were asked the question -- you were asked the

20   question is there any party the same in your lawsuit as this

21   one, right?

22   **A.   True.**

23   Q.   And you answered no.

24   **A.   That's -- would you like for me to answer that?**

25   Q.   No.  I just want you to say yes or no.

1    **A.   Oh, yes.  I answered no.**

2    Q.   Okay.  But that's not how your case started, is it?

3    You --

4         MS. GOLDFADEN:  Objection.

5         **THE WITNESS:  That is correct.**

6         MS. GOLDFADEN:  Not relevant.

7         THE COURT:  Hold on.

8         MR. DEAN:  The Defendant in --

9         MS. GOLDFADEN:  Objection.  Not relevant.

10        THE COURT:  Hold on.  I heard you.

11        The objection was relevance.

12        MR. DEAN:  I just want to clarify his testimony when

13   he said that there were was no party the same in his case, and

14   he did, in fact, sue Mr. Beecher.

15        THE COURT:  Okay.  Go ahead.

16        MR. DEAN:  Or Mr. Becher, excuse me.

17   BY MR. DEAN:

18   Q.   You sued Mr. Becher in this case -- in your case, correct?

19   **A.   Initially, yes, I did, and Mr. Becher was dismissed from**

20   **my case.**

21   Q.   And he was dismissed because you failed to exhaust your

22   grievance remedies, correct?

23   **A.   That's a -- that is correct because I could not get the**

24   **information at the time.**

25   Q.   Okay.  You couldn't get the --

1          MS. GOLDFADEN:  Objection to relevancy.  Grievances

2     aren't relevant to this.

3          THE COURT:  Mr. Dean?

4          MR. DEAN:  Your Honor, we're trying to lay a

5     foundation here that he has a motive to testify against

6     Officer Becher because of his unsuccessful attempt to sue him

7     in his own case.

8          THE COURT:  All right.  I'll give you a little bit of

9     leeway.  Go ahead.

10         MR. DEAN:  Okay.

11    BY MR. DEAN:

12    Q.   You didn't file a grievance within the MDOC policy time to

13    be able to sustain Mr. Becher in your case.  Is that correct?

14    **A.   That is correct.**

15    Q.   Okay.  You filed -- this incident took place in October of

16    2013.  Is that right?

17    **A.   That's correct.**

18    Q.   And your lawsuit naming him as a Defendant was not filed

19    until April 30th, 2015.  Is that also correct?

20    **A.   That's correct.**

21    Q.   You've testified --

22         MS. GOLDFADEN:  Objection.  This is still irrelevant

23    to the case at hand.

24         THE COURT:  Okay.  He's arguing that it's going

25    towards bias.

1          MR. DEAN:  Yes.

2          THE COURT:  Do you want to respond to that?

3          MR. DEAN:  Yes.  It's going towards his bias, and we

4    are going to get there in just a second.

5          May I proceed, Your Honor?

6          THE COURT:  Hold on.  I'm assuming she's going to

7    respond.

8          Are you responding or no?

9          MS. GOLDFADEN:  Yes.  I'm objecting because there is

10   no bias here because he's responding to --

11         THE COURT:  You can't testify.  You've got to tell

12   me -- okay.  Go ahead.

13         MS. GOLDFADEN:  It's an objection to relevancy?  Is

14   that what you mean?

15         THE COURT:  The -- your objection was relevancy.

16         MS. GOLDFADEN:  Yes.

17         THE COURT:  They're indicating it is relevant.  It

18   goes towards bias.  Do you have a response to that?

19         MS. GOLDFADEN:  It doesn't go towards bias, not the

20   grievances.  The grievances don't go towards bias.

21         THE COURT:  That's not what we are talking about at

22   this point.

23         At this point I think the questioning was when he

24   filed a lawsuit, correct, Mr. Dean?

25         MR. DEAN:  That's correct, Your Honor.

1        THE COURT:  Okay.  Go ahead.

2    BY MR. DEAN:

3    Q.   Did you have a conversation with Mr. Scott prior to you

4    filing your lawsuit in which he told you he was filing a suit

5    against Officer Becher?

6    **A.   I had a conversation with Mr. Scott in which at that time**

7    **I had no idea that Mr. Scott was on the bus as one of the guys**

8    **on the bus at the time.  Once I had a conversation -- we was**

9    **in the law library.  I was researching the incident.  Once we**

10   **-- once I found out that Mr. Scott was on the bus as well,**

11   **that's how I was able to get Officer Becher's name.  You can't**

12   **file a grievance unless you have the officer's name to put on**

13   **the grievance.**

14        **The facility staff would not provide me with**

15   **information at the time.  So the only way that I was able to**

16   **follow through with my lawsuit -- this is why it was so late**

17   **was because I got the names from Mr. Scott.**

18   Q.   When did you have this conversation with Mr. Scott?

19   **A.   It was in 2015, I believe.**

20        MR. DEAN:  Thank you.

21        No further questions, Your Honor.

22        THE COURT:  All right.

23        Any follow-up?

24        MS. GOLDFADEN:  Yes.  I have a question for follow-

25   up.

1       THE COURT:  Go ahead.

2                          *REDIRECT EXAMINATION*

3    BY MS. GOLDFADEN:

4    Q.   Mr. Betty, what was your lawsuit about, your prior lawsuit

5    that involved Defendant Becher?

6    **A.   Initially my lawsuit was about Mr. Becher driving the bus**

7    **fast and reckless, and I was injured in the process.**

8    Q.   And --

9    **A.   Mr. Becher was dismissed because I didn't file --**

10   Q.   And what was the other claim?

11   **A.   And the other claim was retaliation against the**

12   **correctional staff for not providing -- for threatening me for**

13   **asking about information concerning the bus incident.**

14   Q.   And that's still pending?

15   **A.   That is still pending, yes, ma'am.**

16       MS. GOLDFADEN:  No further questions.

17       THE COURT:  All right.

18       Anything else?

19       MR. DEAN:  Yes.

20       THE COURT:  Go ahead.

21                          *RECROSS-EXAMINATION*

22   BY MR. DEAN:

23   Q.   The claims that you have a retaliation have nothing to do

24   with Officer Becher, correct?

25   **A.   It started with Officer Becher.  It started with me trying**

| | |
|---|---|
| 1 | to get information against Officer Becher and Defendant -- |
| 2 | excuse me, Mr. Cheney threatening me not to make an incident |
| 3 | -- not to make an incident of the bus -- concerning the bus. |
| 4 | Q.   And so -- |
| 5 | A.   That's how it started. |
| 6 | Q.   And you're not alleging that Officer Becher had anything |
| 7 | to do with that, correct? |
| 8 | A.   To do with the retaliation or to do with the accident? |
| 9 | Q.   The retaliation. |
| 10 | A.   Correct. |
| 11 | MR. DEAN:  Thank you. |
| 12 | No further questions. |
| 13 | THE COURT:  Anything else? |
| 14 | MS. GOLDFADEN:  No, Your Honor. |
| 15 | THE COURT:  All right. |
| 16 | Thank you, sir. |
| 17 | THE COURT:  We're all done. |
| 18 | THE WITNESS:  Okay. |
| 19 | THE COURT:  All right. |
| 20 | (At 2:10 p.m., the witness was |
| 21 | excused.) |
| 22 | THE COURT:  Next witness, please. |
| 23 | MR. MANVILLE:  The next witness will be |
| 24 | Antonio Lewis. |
| 25 | THE COURT:  All right.  We are going to try to |

1    connect with the next witness as well.

2           And, Mr. Dean, there should be another microphone by

3    you.  Is that not working?

4           MR. DEAN:  Can you hear me?

5           THE COURT:  Yeah.  That was better.

6           MR. DEAN:  Okay.  I'll move it closer.

7           THE COURT:  Okay.  Thank you.

8           If anybody needs to stand up and stretch, you can do

9    that as we try to connect.  You can do that at any time, but

10   if you want to do it now, that's fine.  It might take a few

11   minutes.

12          If anybody needs to go back to get anything to drink

13   or a snack, we'll bring you back when we're connected.

14          THE CLERK:  All rise.

15               (At 2:14 p.m., the jury left the

16               courtroom.)

17          THE COURT:  After this witness, who are your other

18   witnesses?

19          MR. MANVILLE:  We -- it will be the photographer, the

20   video guy, and Sadler.

21          THE COURT:  Okay.  And are they all linked in

22   somehow?  Are they on standby in terms of on Zoom?

23          MR. MANVILLE:  I gave them the Zoom steps,

24   Your Honor, and they should be.  I don't have access to the

25   waiting room.

1          THE COURT:  Do we know if anybody is in the waiting

2    room or --

3          There's nobody in there.

4          What time did you tell them to show up?

5          MR. MANVILLE:  I initially said 2, and I got an

6    e-mail from the video person, and I said probably between 2:30

7    and 3.

8          THE COURT:  Okay.  Why don't you e-mail them or

9    contact all of them to get on by 2:30 just so that -- I'd

10   rather have them waiting than not there.

11         All right.  I don't know that it's going to be very

12   long, but I'll step out.

13         Mr. Scott, do you need anything?  Do you need to take

14   a break?

15         MR. SCOTT:  (No verbal response.)

16         THE COURT:  Okay.  Thank you.  We'll get them back

17   out as soon as they get him hooked up.

18         THE CLERK:  All rise.  Court is in recess.

19               (At 2:17 p.m., recessed;

20               reconvened at 2:24 p.m.)

21         THE CLERK:  All rise.

22         THE COURT:  All right.  Thank you.  I think we're

23   back on the record.

24         We have the witness, and we're going to bring in the

25   jury.

1       THE CLERK:  All rise for the jury.

2               (At 2:24 p.m., the jury entered the

3               courtroom.)

4       THE COURT:  All right.  Thank you, everyone.  Please

5   be seated.  I apologize.  It's a lot of coordination, but we

6   are making it happen.  Okay.

7       The next witness --

8       I'm sorry, the name for the record?

9       MS. GOLDFADEN:  The name of the next witness?

10      THE COURT:  Yes.

11      MS. GOLDFADEN:  Is Antonio Lewis.

12      THE COURT:  Okay.  Let's bring in Mr. Lewis.

13      All right.  Mr. Lewis, can you see and hear us?  Sir,

14  can you see and hear me?  Okay.  I think they need to unmute

15  you maybe.  Can you unmute, please?  We can't hear you.

16      MR. LEWIS:  Okay.  All right.  Now can you hear me?

17      THE COURT:  I can.  Can you hear us, obviously?

18      MR. LEWIS:  Yes.

19      THE COURT:  Okay.

20      Tell me your full name, please, and spell your last

21  name.

22      MR. LEWIS:  All right.  Antonio Lewis, L-E-W-I-S.

23      THE COURT:  All right.  Sir, can you stand and raise

24  your right hand to be sworn, please.

25      MR. LEWIS:  All right.

1      THE CLERK:  (Witness was sworn.)

2      MR. LEWIS:  I do.

3      THE COURT:  Thank you, sir.  Please be seated.

4      All right.  Counsel, go ahead.

5      MS. GOLDFADEN:  Thank you.

6                          *ANTONIO LEWIS*

7   called by the Plaintiff at 2:26 p.m., having been duly sworn

8   by the clerk, testified through videoconferencing as follows:

9                      *DIRECT EXAMINATION*

10  BY MS. GOLDFADEN:

11  Q.   All right.  Mr. Lewis, how old are you?

12  **A.   Forty-five.**

13  Q.   And what prison are you currently confined at?

14  **A.   Chippewa Correctional Facility.**

15  Q.   I'm going to move on to some questions about the incident

16  now on October 10th, 2013.  Mr. Lewis, were you confined with

17  the Michigan Department of Corrections on October 10th, 2013?

18  **A.   Yes.**

19  Q.   And on that date, were you placed in a transport bus?

20  **A.   Yes.**

21  Q.   And what prison were you located at before being put on

22  the transport bus?

23  **A.   St. Louis.**

24  Q.   Was that where you were originally coming from in the

25  morning?

1    **A.    Yes.**

2    Q.    And did you stop at any other prisons during your

3    transport?

4    **A.    Yes, Carson City.**

5    Q.    And what prison were you being transported to that day?

6    **A.    RMI in Ionia.**

7    Q.    And what does RMI stand for?

8    **A.    It's Reformatory of Michigan.**

9    Q.    And where were you sitting on the bus on October 10th,

10   2013?

11   **A.    I was sitting toward the back of the bus.  I was about**

12   **maybe a quarter back from being in the back -- fully back of**

13   **the bus.**

14   Q.    And were you in the right or the left side of the bus?

15   **A.    Right side.**

16   Q.    And were you in an aisle or window seat?

17   **A.    It was aisle seat.**

18   Q.    And were there seatbelts on this bus?

19   **A.    No.**

20   Q.    And, Mr. Lewis, can you describe what types of physical

21   restraints are on your body while you're on the bus.

22   **A.    Leg chains and around-the-waist chains for the handcuffs.**

23   Q.    And prior to October 10th, 2013, had you been transported

24   to any other prisons?

25   **A.    No.**

1   Q.   And on October 10th, 2013, did you know who the driver of
2   the transport bus was?
3   **A.   No.**
4   Q.   Did you ever find out who the driver of the transport bus
5   was?
6   **A.   I don't remember his name from the paperwork, but I never**
7   **knew his name at all.**
8   Q.   And, Mr. Lewis, were you paying attention as to how the
9   bus driver drove from Carson City to Ionia?
10  **A.   Yes.**
11  Q.   And why were you paying attention to his driving?
12  **A.   Back roads, little bumpy for a bus of that size.  I've**
13  **always been the type I do not really care to ride buses.  On**
14  **the main street he was doing the speed limit, but for some**
15  **reason on the back roads he was doing a little bit excessive**
16  **speed.**
17  Q.   And what made you feel like he was going excessively in
18  speed?
19  **A.   Oh, the feel of the bumps, shooting past the lines in the**
20  **road, some of the trees.  Just it felt faster than the 55 that**
21  **he was supposed to have been regularly doing.**
22  Q.   And is this partially based on your prior experiences in
23  buses?
24  **A.   Yes.**
25  Q.   And can you explain your prior experiences with buses?

1  **A.   Well, I've been a mechanic for as long as I can remember.**

2  **I've worked on many diesels from trucks to buses.  I work on**

3  **automotive vehicles.  It just been something that I've always**

4  **been into.**

5  Q.   And how long --

6  **A.   I've also driven trucks too.**

7  Q.   -- have you been a mechanic for?

8  **A.   Since I was, like, fourteen years old.**

9  Q.   And did you also drive buses?

10  **A.   Never drove a bus but I drove trucks.**

11  Q.   Did you work on buses while you were a mechanic?

12  **A.   Yes.**

13      MR. DEAN:  Objection.  Relevance.

14      THE COURT:  Relevance?

15      MS. GOLDFADEN:  This is relevant to his understanding

16  of why -- of how fast the bus is going.  This is his

17  understanding of why he thinks this is the way that he is

18  stating.

19      THE COURT:  You mean in terms of description of the

20  speed?

21      MS. GOLDFADEN:  In terms of his understanding of,

22  yes, how fast the bus is going.

23      THE COURT:  Okay.  How is him -- his prior work

24  really relevant to that?  Anybody can testify to speed.

25      MS. GOLDFADEN:  He said he's worked on buses before

1    and trucks and on vehicles, and I assume, you know, if you're

2    driving those two while you're working on them to make sure

3    that they work.

4            THE COURT:  I don't really understand the response.

5    It -- the objection -- you're asking about speed.

6            MS. GOLDFADEN:  Yes.

7            THE COURT:  And now you want to get into a previous

8    employment or some type of work that he's done on buses.  And

9    the objection is how is that relevant, his work on buses?  How

10   is that relevant to the speed that you were asking about?

11           MS. GOLDFADEN:  I can move on from the question.

12           THE COURT:  Go ahead.

13   BY MS. GOLDFADEN:

14   Q.   And, Mr. Lewis, could you see the speedometer from where

15   you were going --

16   **A.   No.**

17   Q.   -- er, where you were sitting, I'm sorry?

18   **A.   No.**

19   Q.   And were you able to ever know what the speed of the bus

20   was?

21   **A.   No.**

22   Q.   Did you have a guesstimate as to how fast the bus was

23   going?

24   **A.   Between, I would say, 60 to 65.**

25   Q.   And how did you come to that determination?

**A.**   I've had an Eldorado once that the speedometer worked on it but the interior light for the speedometer didn't work.  So I would use the lines during the daytime to calculate how fast I was going from the speed at 55.  And if I was going at a particular second -- I guess you could say seconds between lines.  If I was going a little bit too fast and made it to the lines, then I know I was going a little bit faster than normal.

Q.   And, Mr. Lewis, did an incident happen between Carson City and Ionia?

**A.**   Yes.

Q.   And can you describe to the jury what happened?

**A.**   Well, what caught my attention was I thought we was going around a curve at a high rate of speed.  And then all of a sudden I felt the bus drop back down on two wheels.  And after he had -- it was, like, in a left curve.  Once he had corrected it, I felt the wheels on the right-hand side drop back down, and that's when some inmates that was sitting across from me had landed on my ankle, and a lot of people was complaining about being hurt.  One guy complaining about a nose and another one about a mouth bleeding.

Q.   And was Defendant speeding before the incident?

**A.**   Not on the main roads.

Q.   Was he speeding on any other roads?

**A.**   Just the back roads.

1  Q.   And was he speeding at the time of the incident?

2  **A.   Yes.**

3  Q.   And did you say anything to him about his driving?

4  **A.   No.**

5  Q.   Did anyone else yell out to him or say anything to him

6  about his driving?

7  **A.   Yes.   A few inmates had yelled to him to allow one of the**

8  **other COs that was riding with him to let them drive.**

9  Q.   And did Defendant respond to any of those comments?

10  **A.   He made the remark about missing a dead animal that was in**

11  **the road.**

12  Q.   And were you ever thrown out of your seat during the

13  incident?

14  **A.   No.**

15  Q.   And, if you know, were other prisoners thrown out from

16  their seats?

17  **A.   Yes.**

18  Q.   Do you remember about how many?

19  **A.   I know two that landed on my ankle.   There was a few more**

20  **behind me, and there was some up front.   I remember the female**

21  **CO that was sitting behind the driver was thrown out of her**

22  **seat, and she landed into the lap of the male CO that was**

23  **sitting on the passenger's side, right-hand side, and he had**

24  **helped her to get back up into her seat.**

25  Q.   And did anybody after the incident complain of injuries?

1    **A.    Yes.**

2    Q.    And about how many were complaining of injuries?

3    **A.    I know there was more than five.**

4    Q.    Did you -- were you injured?

5    **A.    No.  Oh, no.  Yes, I was.  I'm sorry about that.  I just**

6    **had a slight ankle pain for, like, two days from the inmates**

7    **that was sitting across from me landed on my ankle.**

8    Q.    And did you complain at that time period just after the

9    incident about your injuries?

10   **A.    No.**

11   Q.    And did you hear the other two correctional officers

12   mention a dead animal in the road?

13   **A.    No.**

14   Q.    And what did Defendant do after regaining control of the

15   vehicle?

16   **A.    He had mentioned -- once the inmates was trying to get him**

17   **to allow one of the other COs to drive the bus, he had**

18   **mentioned that at least he kept it out -- you know, from going**

19   **into a ditch.**

20   Q.    And during the incident, could you see out the window?

21   **A.    Yes.**

22   Q.    And were you ever looking out the front windshield?

23   **A.    Every now and then I would, but I mostly kept my head**

24   **down.**

25   Q.    Were you looking out the front windshield around the time

1  of the incident?

2  **A.    No.**

3  Q.    And did any -- did Defendant say anything to you at all as

4  you were getting off the bus after the incident?

5  **A.    Not that I can recall.**

6          MS. GOLDFADEN:  May I have a moment, Your Honor, to

7  talk with my co-counsel?

8          THE COURT:  Go ahead.

9          MS. GOLDFADEN:  Thank you.

10          No further questions.

11          THE COURT:  Thank you.

12          Cross?

13          MR. DEAN:  Yes, Your Honor.

14                          *CROSS-EXAMINATION*

15  BY MR. DEAN:

16  Q.    Mr. Lewis, you testified that on the main roads you didn't

17  think he was speeding.

18  **A.    Right.**

19  Q.    Okay.  The main roads.  Did you mean that to mean the

20  highways?

21  **A.    I guess you can call it the secondary -- the firstdary**

22  **[sic] road, secondary road, or whatever.  It wasn't exactly**

23  **like a freeway.  It's a two-lane highway.  We -- this is**

24  **coming from Carson City.**

25  Q.    And so it was just the back country roads, I think you

1   said, that he was driving what you thought a little bit

2   excessively?

3   **A.   Yes.**

4   Q.   Okay.  Was he swerving in and out of lanes through that

5   trip?

6   **A.   No.**

7   Q.   Okay.  Kept it on the same lane that he was driving at

8   least until the incident that you described at the end,

9   correct?

10  **A.   Correct.**

11  Q.   Okay.  Another witness that you didn't listen to described

12  it as he thought he was driving 100 miles an hour.  Would you

13  agree with that assessment?

14  **A.   That cannot happen, not with that bus.  It has a governor**

15  **on it that will not allow you to go over 74.**

16          MS. GOLDFADEN:  Objection.  Objection to speculation.

17          THE COURT:  Mr. Dean?

18          MR. DEAN:  I don't think he was speculating.  They

19  just elicited testimony for five minutes on his previous

20  mechanic background.  I just asked if he thought it was

21  accurate that it was 100 miles an hour, and he said no, and

22  that's all the answer that I needed.

23          MS. GOLDFADEN:  But you're asking him to speculate on

24  what the other witness said, and I move to strike the answer.

25          THE COURT:  Mr. Dean?

1          MR. DEAN:  I'll rephrase.

2          THE COURT:  Go ahead.

3  BY MR. DEAN:

4  Q.  Do you think that bus was driving 100 miles an hour that

5  day?

6  **A.  No.**

7  Q.  Thank you.  You said that he was -- you could calculate

8  the lines how fast you were going.  What did you mean by that?

9  **A.  All right.  When -- like I said, when my Eldorado had the**

10  **light out at night when I was driving, in order for me to know**

11  **that I'm not doing over 55, there is a certain amount of**

12  **distance between the two yellow lines of the middle of the**

13  **roadway.  If I make it to -- from the end of one line to the**

14  **next line before a second and a half, then that let's me know**

15  **I'm doing well over 55.**

16  Q.  Okay.  Were you making that calculation on this bus ride?

17  **A.  No.**

18  Q.  Okay.  You testified about the -- it seemed like it

19  dropped down on two wheels, and you said there was a left

20  turn, and the wheels on the right went down.  Which two wheels

21  are you saying that you thought were -- did you say they were

22  up in the air?

23  **A.  It was the right-hand side.**

24  Q.  Okay.  They felt like they were coming off the road a bit?

25  **A.  Yes, it did.**

1    Q.   Okay.  Did they feel like they were coming up in the air

2    or that they didn't have contact with the road anymore?

3    **A.   They didn't have contact with the road.**

4    Q.   Okay.  So the right side of the bus.

5    **A.   Yes.**

6    Q.   Okay.  You didn't file a lawsuit in this case, did you?

7    **A.   No.**

8         MR. DEAN:  Okay.

9         That's all I have, Your Honor.  Thank you.

10        THE COURT:  Thank you.

11        Any redirect?

12        MS. GOLDFADEN:  A couple.

13                        *REDIRECT EXAMINATION*

14   BY MS. GOLDFADEN:

15   Q.   Mr. Lewis, when you were talking about the incident on the

16   road, you said that he was going around a left curve, and he

17   was trying to correct it, and that's when he went off the

18   road.  Can you please re-explain that --

19   **A.   All right.**

20   Q.   -- in more detail?

21   **A.   I was -- all right.  I had my head down.  And every now**

22   **and then I would look up, but at the time when it felt like we**

23   **was going in a left turn, left-hand turn, or whatever, or**

24   **curve, I just happened to look up because I'm, like, "Why is**

25   **this bus going around the curve so fast?"**

1          And then that's when all of a sudden he made the

2    correction, and that's when I felt the bus drop back down on

3    the right-hand side after he had made the correction because

4    once he made the correction, that's when the wheels had went

5    up a little bit, and then it dropped back down.  And that's

6    when it tossed the inmates and the CO that was on the

7    left-hand side over to the right-hand side; those who did come

8    out their seats.

9    Q.   So when Defendant was going around the curve and corrected

10   it, was there a curve that he was driving on?

11   A.   Not that I seen.

12   Q.   So was the road straight?

13   A.   It's a straight street.

14   Q.   So he was curving on the road while there was a straight

15   street?

16   A.   No.  I thought it was a straight road until all of a

17   sudden when he made the turn, you know, it wasn't like he was

18   making a left-hand turn.  It just the curve of the road I

19   thought he was going around.  And the next thing you know when

20   I realize he was correcting the bus, that let me know that the

21   road was straight, but it just -- he was trying to correct and

22   keep the bus from going off the road.

23   Q.   And so would that him -- would that essentially be -- in

24   your opinion, does that seem like he's swerving?

25   A.   Yes.

1   Q.   And at the incident, then, he was swerving?

2   **A.   Yes.**

3   Q.   And so if he was swerving before the incident, were there

4   any injuries during those swerves?

5   **A.   Yes.**

6           MS. GOLDFADEN:  I have no further questions.

7           THE COURT:  Anything else?

8           MR. DEAN:  Nothing further, Your Honor.

9           THE COURT:  All right.

10          Thank you, sir.  We're all set.

11          **THE WITNESS:  All right.**

12          (At 2:43 p.m., the witness was excused.)

13          (End of requested excerpt)

14                                                  *****

15

16

17

18

19

20

21

22

23

24

25

1          *REPORTER'S CERTIFICATE*

2

3               I, Melinda I. Dexter, CSR-4629, Official Court

4     Reporter for the United States District Court for the Western

5     District of Michigan, appointed pursuant to the provisions of

6     Title 28 U.S.C. § 753, do hereby certify that the foregoing

7     is a true and correct excerpt from the proceedings had in the

8     within entitled and numbered cause on the date hereinbefore

9     set forth; and I do further certify that the foregoing

10    transcript has been prepared by me or under my direction.

11    WITNESS my hand this date, March 8, 2021.

12

13

14    _____

15    Melinda I. Dexter, CSR-4629, RMR, CRR
      U.S. District Official Court Reporter
16    128 Federal Building
      315 West Allegan Street
17    Lansing, Michigan 48933

18

19

20

21

22

23

24

25

1

*EXAMINATION INDEX*

2
                                                                 PAGE

3

WITNESSES:  PLAINTIFF

4

QUENTIN BETTY
      Direct Examination by Ms. Goldfaden     3
5
      Cross-Examination by Mr. Dean           12
      Redirect Examination by Ms. Goldfaden   18
6
      Recross-Examination by Mr. Dean        18

7

ANTONIO LEWIS
      Direct Examination by Ms. Goldfaden     23
8
      Cross-Examination by Mr. Dean           31
      Redirect Examination by Ms. Goldfaden   34

9

10

11

12

13

EXHIBITS:                                    RECEIVED
14

None
15

16

17

18

19

20

21

22

23

24

25